WO                IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

SUSAN CHRISTINE WHITTAKER,    )
                                                      )
                                  Plaintiff,    )
                                                      )
  vs.                                                     )
                                                      )
NANCY A. BERRYHILL, acting        )
Commissioner, Social Security Administration,  )
                                                     )    No. 3:17-cv-0172-HRH
                                  Defendant.  )
_____)

O R D E R

This is an action for judicial review of the denial of disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Plaintiff Susan Christine Whittaker has timely filed her opening brief,[1] to which defendant, Nancy A. Berryhill, the acting Commissioner of the Social Security Administration, has responded.[2] Oral argument was not requested and is not deemed necessary.

Procedural Background

On August 11, 2010, plaintiff filed an application for disability benefits under Title

---

[1]Docket No. 11.

[2]Docket No. 12.

II of the Social Security Act.[3] Plaintiff alleged that she became disabled on August 20, 1999. Plaintiff alleges that she is disabled due to back and knee problems, cervical fusion, temporomandibular joint dysfunction (TMJ), and migraines. Plaintiff's application was denied initially on February 22, 2011. Plaintiff requested a hearing, and an administrative hearing was held on August 25, 2011. On September 9, 2011, an administrative law judge (ALJ) denied plaintiff's application. Plaintiff sought review of the ALJ's decision, and on April 4, 2013, the Appeals Council remanded the matter to the ALJ. After remand, an administrative hearing was held on August 8, 2013. On August 27, 2013, the ALJ again denied plaintiff's application. On February 12, 2015, the Appeals Council denied plaintiff's request for review of the ALJ's August 27, 2013 decision. Plaintiff sought judicial review. On January 11, 2016, pursuant to the parties' stipulation, the matter was remanded for further proceedings. On remand, administrative hearings were held on September 28, 2016 and February 27, 2017. On May 3, 2017, the ALJ again denied plaintiff's application. The Appeals Council did not assume jurisdiction within thirty days of the ALJ's May 3, 2017 decision, thereby making this the final decision of defendant.

On August 14, 2017, plaintiff commenced this action in which she asks the court to find that she is entitled to disability benefits.

---

[3]Plaintiff had previously been granted benefits for a closed period of disability beginning on August 11, 1993 and ending on September 30, 1994 based on severe impairments of "cervical/thoracic strain, subglenoid sprain and cephalalgia." Admin. Rec. at 84, 87-88.

General Background

Plaintiff was born on February 25, 1958. Plaintiff was 41 years old on her alleged onset date. Plaintiff has a high school education plus two years of college. Plaintiff is married and has two daughters. Plaintiff's past work includes work as a computer hardware technician, a secretary, a desktop publisher, and an administrative clerk.

The ALJ's May 3, 2017 Decision

The ALJ first determined that plaintiff "last met the insured status requirements of the Social Security Act on December 31, 2002."[4] Thus, in order to be eligible for Title II benefits, plaintiff must have been disabled on or before December 31, 2002. In other words, the relevant time period for plaintiff's application for benefits is August 20, 1999 through December 31, 2002.

The ALJ then applied the five-step sequential analysis used to determine whether an individual is disabled.[5]

---

[4]Admin. Rec. at 813.

[5]The five steps are as follows:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
> Step two: Is the claimant's alleged impairment sufficiently severe to limit ... her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not,

(continued...)

At step one, the ALJ found that plaintiff "did not engage in substantial gainful activity during the period from her alleged onset date of August 20, 1999 through her date last insured of December 31, 2002...."[6]

At step two, the ALJ found that "[t]hrough the date last insured, the claimant had the following severe impairments: cervical spine degenerative disc disease, status post-surgery; lumbar spine degenerative disc disease with herniated nucleus pulposus at L5-S1, status-post surgery; carpal tunnel syndrome, status-post release on the right; obesity...."[7] The ALJ found plaintiff's TMJ non-severe.[8]

At step three, the ALJ found that "[t]hrough the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the

---

[5](...continued)
   proceed to step four.
   Step four: Does the claimant possess the residual functional capacity ("RFC") to perform ... her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
   Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow ... her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

[6]Admin. Rec. at 813.

[7]Admin. Rec. at 813.

[8]Admin. Rec. at 813.

-4-

severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1...."[9] The ALJ's step three finding was based on the testimony of Dr. Sklaroff,[10] who testified as a medical expert at the September 28, 2016 hearing. Dr. Sklaroff's opinion as to whether plaintiff's impairments met or equaled any of the listings is discussed below in detail.

"Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's RFC." Bray v. Comm'r of Social Security Admin., 554 F.3d 1219, 1222–23 (9th Cir. 2009). The ALJ found that "through the date last insured, the claimant had the residual functional capacity to perform the full range of medium work as defined in 20 CFR 404.1567(c)."[11]

The ALJ found plaintiff's pain and symptom statements to be inconsistent with the medical evidence and plaintiff's statements during treatment.[12] The ALJ also found that plaintiff had shown medical improvement after her lumbar and cervical spine surgery.[13]

The ALJ gave great weight to Dr. Sklaroff's opinion.[14] The ALJ gave little weight

---

[9]Admin. Rec. at 813.

[10]Admin. Rec. at 813.

[11]Admin. Rec. at 814.

[12]Admin. Rec. at 815.

[13]Admin. Rec. at 815-816.

[14]Admin. Rec. at 817. Dr. Sklaroff testified that plaintiff "should be able to sit, walk ... up to six hours during a normal eight-hour day with normal breaks. Posture, push, pull, squat, bend with proper analgesics, no limit. Lift 50 pounds occasionally, 25 pounds
(continued...)

to Dr. Caldwell's opinion.[15] The ALJ gave no weight to the opinions of Dr. Voke.[16] The ALJ also gave no weight[17] to the opinion of Dr. Christensen.[18] And, the ALJ gave no

---

[14](...continued)
frequently.... No problems with the eyes, ears, special sense, hands, feet, and nothing in the environment." Admin. Rec. at 873.

[15]Admin. Rec. at 817. On February 7, 2011, Dr. Jay Caldwell opined that plaintiff could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk for 6 hours; sit for 6 hours; frequently push/pull with her upper right extremities; occasionally climb ladder/scaffolds, stoop, and crouch; was unlimited as to climbing ramps/stairs, balancing, kneeling, and crawling; occasionally overhead reach; frequently handle and finger on her right hand but was unlimited as to her left hand; should avoid concentrated exposure to extreme cold, heat, wetness, humidity, noise, fumes, gas, odors, dust, poor ventilation, and hazards; and should avoid moderate exposure to vibration. Admin. Rec. at 544-547.

[16]Admin. Rec. at 817. Dr. Voke was an orthopaedic surgeon. During the relevant time, Dr. Voke did three surgeries on plaintiff. On October 26, 2001, Dr. Voke did "a lumbar laminectomy for herniated nucleus pulposus, L5-S1, on the left side...." Admin. Rec. at 421. On April 25, 2002, Dr. Voke did carpal tunnel release on the right. Admin. Rec. at 421. And, on June 20, 2002, Dr. Voke did "an anterior cervical fusion, C6-7, with an autogenous right iliac bone graft[.]" Admin. Rec. at 419. On October 17, 2001, prior to plaintiff's lumbar surgery, Dr. Voke noted that plaintiff was "obviously incapacitated" due to her lumbar spine issues. Admin. Rec. at 514. On November 5, 2001, shortly after her lumbar surgery, he noted that plaintiff should "continue with sedentary activities." Admin. Rec. at 512. On July 9, 2002, which was after plaintiff's cervical fusion, Dr. Voke noted that plaintiff should "continue with normal sedentary activities." Admin. Rec. at 496.

[17]Admin. Rec. at 817.

[18]Ronald Christensen, M.D., examined plaintiff on May 31, 2013, which was long after plaintiff's last date insured. Dr. Christensen noted that "[i]n November of 2010 [plaintiff] underwent a bilateral total knee replacement. She developed an allergy to the metal prosthesis. She underwent a second surgery in 2011 to remove the original hardware and replace it with hypo-allergic titanium knee. Following that surgery she has developed regional sympathetic dystrophy." Admin. Rec. at 325. Dr. Christensen noted that plaintiff

> has extremely limited mobility. She is unable to stand or walk

(continued...)

weight[19] to ANP Buchanan's opinion.[20]

---

[18](...continued)
> for more than a few seconds unassisted. Her balance is poor. She tends to fall. She appears to be pretty much confined to a wheelchair or her bed. She has multiple problems, the greatest of which is her failed total knee replacement and regional sympathetic dystrophy. She has also had a lumbar disc surgery times two which has left her with a residual of recurrent, chronic back pain. She has had a cervical fusion which again has left her with residual recurrent neck pain. She has carpal tunnel syndrome. She has had some improvement following right carpal tunnel release. She is now having symptoms in her left hand. The patient has chronic recurrent migraine headaches. The patient requires significant amount of help with her activities of daily living.

Admin. Rec. at 328. He opined that plaintiff was "not a candidate at this time to return to any kind of gainful employment." Admin. Rec. at 328.

[19]Admin. Rec. at 817.

[20]On September 20, 2016, Bethany Buchanan, ANP, wrote the following letter to the ALJ:

> Mrs. Whittaker has been a patient of mine since November 1997. During 1998 and 1999, Mrs. Whittaker was healthy and active, caring for her toddler and newborn. Late August 1999, Mrs. Whittaker developed pain in her left heel, the chronicity of which lead her to urgent care and was diagnosed with plantar fasciitis (PF) and ultimately was referred to Dr. Kenneth Swayman, DPM. Over the next 18 months, the diagnosis of PF became questionable as it did not respond to the usual allopathic treatment modalities. The treatments included: bilateral cortisone injections every other week for 3-4 months, medications (cox 2 inhibitors and narcotics) orthotics (4 or 5 different pairs), removable walking cast and crutches, and specific boots designed for treating PF. Ultimately none of these interventions were helpful and her condition progressed to increased difficulty

(continued...)

[20](...continued)
with ambulating. Surgery to sever the fascia bilaterally was recommended.

Mrs. Whittaker began to feel incapacitated during this time (2001) and unable to work. She also noted a recurrence of sciatica, recurring migraines and TMJD. Eventually Dr. Leon Chandler diagnosed the rupture of her L4-5 intervertebral disc in October of 2001, and the etiology of her foot pain and sciatica became clear. Dr. Chandler referred her to an orthopedic surgeon, Dr. Edward Voke, who performed a discectomy and laminectomy two weeks later. The discectomy resolved the pain in Mrs. Whittaker's feet, but it left her with permanent lower back pain and exacerbated the sciatica. It also caused neuropathy in her bilateral upper extremities (2002) and decreased fine motor skills in her right hand. She was referred to a neurologist for EMG studies.

Additionally between October 2001 and July 2002, Mrs. Whittaker was hospitalized for peptic ulcers secondary to NSAID overuse, right carpel tunnel release, a cervical fusion, and in 2003 had a cholecystectomy. Between 2003 and 2007, Mrs. Whittaker underwent several upper endoscopies and a colonoscopy for undiagnosed abdominal/intestinal pain.

In 2008, Mrs. Whittaker was diagnosed with osteoarthritis of her knees. For two years she received regular bilateral injections of Syn-Visc, to no avail. In 2010, it was noted that she had no cartilage in her right knee, and only 15% present in her left knee. She underwent bi-lateral knee replacements. Unfortunately she did not do well with this secondary to an allergic reaction to the material composition. She experienced chronic knee pain, rash and slow healing. Nine months later she had a bilateral revision of the replacements which left her with continued chronic knee pain and an inability to use her knees to the point where she was unable to ambulate on her own, requiring a wheelchair.

Mrs. Whittaker has had chronic pain from all these issues, which has been managed 100% of the time via pain clinics and with pain specialists.

(continued...)

At step four, the ALJ found that "[t]hrough the date last insured, the claimant was capable of performing past relevant work as a general clerk and desktop publishing assistant. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity....."[21] This finding was based on the testimony of the vocational expert.[22]

The ALJ thus concluded that plaintiff "was not under a disability, as defined in the Social Security Act, at any time from August 20, 1999, the alleged onset date, through December 31, 2002, the date last insured...."[23]

Standard of Review

Pursuant to 42 U.S.C. § 405(g), the court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner...." The court "properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards." Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997). "Substantial evidence

---

[20](...continued)
> It is my professional opinion that Mrs. Whittaker is permanently disabled.

Admin. Rec. at 1790-1791.

[21]Admin. Rec. at 818.

[22]Admin. Rec. at 818. Raymond North testified as the vocational expert at the February 27, 2017 hearing. Admin. Rec. at 848-857.

[23]Admin. Rec. at 818.

is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)). "'To determine whether substantial evidence supports the ALJ's decision, [the court] review[s] the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.'" Id. (quoting Andrews, 53 F.3d at 1039). If the evidence is susceptible to more than one reasonable interpretation, the court must uphold the Commissioner's decision. Id. But, the Commissioner's decision cannot be affirmed "'simply by isolating a specific quantum of supporting evidence.'" Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999)).

## Discussion

Plaintiff first argues that the ALJ erred at step three in finding that her impairments did not meet Listing 1.04A. "To meet a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim." Tackett, 180 F.3d at 1099. To meet Listing 1.04A,[24] plaintiff must show that she has a

> [d]isorder[] of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) of the

---

[24]Plaintiff contends that she is arguing that she meets Listing 1.04B and 1.04C as well, but plaintiff cites to no evidence that suggests that she meets these Listings. Listing 1.04B requires evidence of spinal arachnoiditis and Listing 1.04C requires evidence of lumbar spinal stenosis resulting in pseudoclaudication.

spinal cord. With:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

There is no dispute that plaintiff had a herniated nucleus pulposus that resulted in compromise of the nerve root.[25] There is also no dispute that there is evidence of nerve root compression characterized by neuro-anatomic distribution of pain,[26] limitation of motion of the spine,[27] sensory or reflex loss,[28] and positive straight leg raising.[29] The dispute here is whether there was any motor loss associated with plaintiff's lumbar spine disorder. Motor loss is defined in Listing 1.04A as atrophy with associated muscle weakness or muscle weakness. A physical finding such as this "must be determined on the basis of objective observation during the examination and not simply a report of the individual's allegation; e.g., 'He says his leg is weak, numb.'" 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00(D).

The ALJ relied on Dr. Sklaroff's testimony that plaintiff's lumbar spine disorder did

---

[25] Admin. Rec. at 421, 519.

[26] Admin. Rec. at 509, 510, 511, 514.

[27] Admin. Rec. at 511, 514.

[28] Admin. Rec. at 509, 514.

[29] Admin. Rec. at 387, 514.

-11-

not meet Listing 1.04A[30] Dr. Sklaroff testified that what was missing was "the motor loss...."[31] He testified that he would not take plaintiff's complaints of leg pain at face value because he would want "something to corroborate it and explain why."[32] He testified that "it's unclear from that faction of the record [dealing with plaintiff's lumbar spine disorder] that there was a radiculopathy consistent with 1.04A in terms of there being a concomitant motor component."[33] Dr. Sklaroff agreed that plaintiff had nerve root compression but testified that "it's just not enough."[34] He insisted that "[t]here's no motor component. It's all sensory."[35]

Plaintiff argues however that there is evidence of motor loss associated with her lumbar spine disorder. She points to her complaints of pain and numbness in her legs[36] and Dr. Voke's December 3, 2001 diagnosis of "[c]hronic radiculopathy, both lower extremities, secondary to degenerative disk disease and nerve root irritation.[37] But, plaintiff's subjective complaints are not sufficient. See 20 C.F.R. § 416.929(a) ( "statements about your pain or

---

[30] Admin. Rec. at 813.

[31] Admin. Rec. at 876.

[32] Admin. Rec. at 877.

[33] Admin. Rec. at 872.

[34] Admin. Rec. at 880.

[35] Admin. Rec. at 881-882.

[36] Admin. Rec. at 509-511.

[37] Admin. Rec. at 511.

other symptoms will not alone establish that you are disabled"). It is also not sufficient that Dr. Voke diagnosed plaintiff with radiculopathy. See Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990) (mere diagnosis of a listed impairment "is not sufficient to sustain a finding of disability"). In order for plaintiff to meet Listing 1.04A, there must be some objective evidence of motor loss associated with her lumbar spine disorder.

Here, there is substantial objective evidence to the contrary. On May 17, 2001, Dr. Rhyneer found that plaintiff's "muscle strength [was] normal bilaterally in both lower extremities."[38] On October 21, 2001, Dr. Lee noted that plaintiff's lower extremity "motor strength ... appears to be appropriate."[39] On April 18, 2002, Dr. Lee's "focused examination of the lower extremity reveal[ed] good motor tone and strength."[40] And, on June 10, 2002, Dr. Lee found that "[t]here is no muscle tone atrophy or wasting appreciated."[41] In light of this evidence, the ALJ did not err in finding that plaintiff's lumbar spine disorder did not meet Listing 1.04A.

Plaintiff next argues that the ALJ erred in finding that her impairments did not equal Listing 1.04A. "To equal a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant

---

[38]Admin. Rec. at 748.

[39]Admin. Rec. at 445.

[40]Admin. Rec. at 760.

[41]Admin. Rec. at 424.

listed impairment[.]'" Tackett, 180 F.3d at 1099 (quoting 20 C.F.R. § 404.1526).

The ALJ again relied on Dr. Sklaroff's testimony to find that plaintiff had not established that her impairments equaled Listing 1.04A. Dr. Sklaroff testified that the "issue that arises is whether or not she had radiculopathy that was definable in conjunction with this entire constellation" of impairments.[42] He testified that although in June 2002, plaintiff was having neck pain and still having back pain, "there was no muscle tone atrophy or wasting appreciated. So that it seems that the presentation, and this is as of 2002, was primarily pain-related."[43] He testified that "perhaps if you had other components that would suggest maybe some earlier motor problems. But you don't have that either."[44] He testified that even if radiculopathy was the cause of plaintiff's pain, there was no "association of radiculopathy with a motor problem."[45]

Plaintiff argues however that she did have motor loss associated with her cervical spine impairment and/or her carpal tunnel syndrome. Plaintiff points to evidence that she had weakness and numbness in her hands,[46] numbness and tingling in her left arm,[47] and

---

[42] Admin. Rec. at 872.

[43] Admin. Rec. at 872.

[44] Admin. Rec. at 877.

[45] Admin. Rec. at 880.

[46] Admin. Rec. at 509.

[47] Admin. Rec. at 494.

intermittent pain in her right arm after the carpal tunnel surgery.[48]

But as discussed above, plaintiff's subjective complaints are not sufficient to establish that she equals Listing 1.04A. There must be some objective evidence that plaintiff had motor loss associated with her cervical spine disorder and/or her carpal tunnel syndrome, which there is in the form of plaintiff's April 10, 2002 abnormal nerve conduction study.[49] This study showed that plaintiff had some motor loss in her wrists, with the loss greater in her right than her left.[50] The problem here though is that there is no evidence that this motor loss lasted or was expected to last for a continuous twelve-month period. Fifteen days after her April 10, 2002 nerve conduction study, plaintiff had carpal tunnel release on the right,[51] surgery which plaintiff testified was generally successful.[52] Although plaintiff testified that she never regained all of her right hand strength after her carpal tunnel release,[53] there is no objective evidence corroborating this. In fact, on June 10, 2002, Dr. Lee found that

---

[48]Admin. Rec. at 492.

[49]Admin. Rec. at 758.

[50]Admin. Rec. at 758.

[51]Admin. Rec. at 421.

[52]Plaintiff testified that after her April 2002 carpal tunnel surgery, her right "hand improved tremendously." Admin. Rec. at 841. She also testified that the carpal tunnel release she had on her right hand was very helpful. Admin. Rec. at 41. And, on September 25, 2002, she told Dr. Lee that "her carpal tunnel symptoms are 60% improved." Admin. Rec. at 494.

[53]Admin. Rec. at 841.

plaintiff's "[g]rip [was] within normal limits on the left and right."[54] Moreover, while ANP Jasper treated plaintiff for hand and arm pain in 2000-2001,[55] there is no objective evidence in Jasper's treating notes as to any motor loss associated with this pain. The ALJ did not err in finding that plaintiff's impairments did not equal Listing 1.04A.

Plaintiff next argues that the ALJ erred in assessing her RFC because the ALJ failed to take into account the failed cervical fusion at C6-C7. Plaintiff contends that the fusion at C6-C7 was only partially successful and that she had restricted range of motion of her cervical spine as a result. Plaintiff argues that if the ALJ had considered the failed C6-C7 fusion, she would have included additional limitations in plaintiff's RFC as there is evidence that the restricted range of motion limited plaintiff's ability to lift and carry and use her hands.[56]

The evidence does not support plaintiff's contention that her cervical fusion at C6-C7 was only partially successful. This contention is based on the January 8, 2003 CT scan of plaintiff's spine that showed "partial bony fusion in the right half but no evidence for bony fusion on the left...."[57] Dr. Voke felt that there might be some nonunion and sent plaintiff

---

[54]Admin. Rec. at 424.

[55]Admin. Rec. at 338, 345, 365, 370, 371.

[56]See Admin. Rec. at 845-846 (plaintiff's testimony about the difficulties she has picking up items).

[57]Admin. Rec. at 516.

to a consultation with Dr. Eule,[58] who on March 19, 2003, indicated that he believed that the CT scan and MRI showed solid fusion at C6-C7.[59] Dr. Eule's belief was confirmed by a July 21, 2011 MRI of plaintiff's cervical spine, which showed "[s]olid block fusion at C6-C7...."[60]

Plaintiff next makes a conclusory argument that the ALJ erred in finding her pain and symptom statements less than credible. The court need not consider this argument because it was not "'argued specifically and distinctly in [plaintiff's] opening brief.'" Indep. Towers of Wash. v. Wash., 350 F.3d 925, 929 (9th Cir. 2003) (quoting Greenwood v. Fed. Aviation Admin., 28 F.3d 971, 977 (9th Cir. 1994)); see also, United States v. Loya, 807 F.2d 1483, 1487 (9th Cir.1987) (court need not consider issues raised in a brief but not argued).

Finally, plaintiff makes a somewhat conclusory argument that Dr. Sklaroff's opinions should not be entitled to any weight because he failed to provide a useful narrative summary of the medical records. Plaintiff also complains that Dr. Sklaroff had an abusive attitude toward her attorney and about the fact that he took two phone calls during his testimony. Plaintiff contends that the ALJ did nothing to restrain Dr. Sklaroff from insulting her attorney and to require him to focus on her claim.

Dr. Sklaroff adequately explained why plaintiff's impairments did not meet or equal Listing 1.04A. As for plaintiff's other complaints regarding Dr. Sklaroff, he was somewhat

---

[58]Admin. Rec. at 491.

[59]Admin. Rec. at 488.

[60]Admin. Rec. at 1216.

impatient with and rude to plaintiff's attorney. But, that does not mean that the ALJ erred in relying on his testimony. Plaintiff's attorney was allowed to ask all the questions he had of Dr. Sklaroff and the ALJ adequately developed the record on the issue of whether plaintiff's impairments met or equaled Listing 1.04A.

## Conclusion

Based on the foregoing, the Commissioner's decision is affirmed. The clerk of court shall enter judgment dismissing plaintiff's complaint with prejudice.

DATED at Anchorage, Alaska, this 28th day of March, 2018.

/s/ H. Russel Holland
United States District Judge